[Cite as *State v. Salyers*, 2021-Ohio-2978.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,               CASE NO. 1-20-55

    v.

GABRIEL W. SALYERS,                  O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Allen County Common Pleas Court
Trial Court No. CR 2018 0143

Judgment Affirmed

Date of Decision: August 30, 2021

APPEARANCES:

    *Patrick T. Clark* **for Appellant**

    *Jana E. Emerick* **for Appellee**

**MILLER, J.**

{¶1} Defendant-appellant, Gabriel W. Salyers, appeals the November 3, 2020 judgment of the Allen County Court of Common Pleas denying his petition for postconviction relief. For the reasons that follow, we affirm.

*Background*

{¶2} This case arises from the April 3, 2018 death of J.S., the minor child of Shelly Wireman. Salyers and Wireman, who were in a romantic relationship at the time of the incident, lived together with Wireman's children from previous relationships, including J.S. Salyers's children from previous relationships would also sometimes be present. On April 1, 2018, Wireman made an emergency call to report that she found J.S. unresponsive in his bedroom. J.S. was transported to the hospital, and he was pronounced dead on April 3, 2018. During an interview with law enforcement, Salyers admitted he shook J.S., applied pressure to his abdomen with his fist, and flicked his penis.

{¶3} We have previously recited much of the factual and procedural background of this case, and we will not duplicate those efforts here. *State v. Salyers*, 3d Dist. Allen No. 1-19-17, 2020-Ohio-147, ¶ 1-7. Relevant to this appeal, on May 17, 2018, the Allen County Grand Jury indicted Salyers on seven counts: Count One of aggravated murder in violation of R.C. 2903.01(C), an unclassified felony; Count Two of murder in violation of R.C. 2903.02(B), an unclassified

felony; Counts Three through Five of endangering children in violation of R.C. 2919.22(B)(1), second-degree felonies; Count Six of domestic violence in violation of R.C. 2919.25(A), a fourth-degree felony; and Count Seven of possession of drugs in violation of R.C. 2925.11(A), a first-degree misdemeanor.

{¶4} On May 23, 2018, Salyers's trial counsel filed a notice of appearance. On May 24, 2018, Salyers appeared for arraignment and pleaded not guilty to the counts of the indictment.

{¶5} The case proceeded to a jury trial on March 12-15 and 18-19, 2019. On March 19, 2019, the jury found Salyers guilty of Counts Two, Three, Four, Five, Six, and Seven. However, the jury found Salyers not guilty of the aggravated-murder charge in Count One. The trial court accepted the jury's verdict and found Salyers guilty of Counts Two, Three, Four, Five, Six, and Seven.

{¶6} That same day, the trial court sentenced Salyers. The trial court found that Counts Two, Four, and Six merged for the purpose of sentencing, and the State elected to proceed on Count Two. The trial court sentenced Salyers to 15 years to life in prison on Count Two, 8 years in prison on Count Three, 8 years in prison on Count Five, and 180 days in jail on Count Seven. Further, the trial court ordered the prison terms imposed for Counts Two, Three, and Five to be served consecutively to each other for an aggregate prison term of 31 years to life. The trial court ordered the sentence for Count Seven to run concurrently to the prison

terms imposed on Counts Two, Three, and Five. On March 20, 2019, the trial court filed its judgment entry of conviction and sentence.

{¶7} On April 10, 2019, Salyers filed a notice of appeal with this court. New counsel was appointed for Salyers's direct appeal. In his direct appeal, Salyers raised three assignments of error. In his first assignment of error, Salyers argued his trial counsel was ineffective for stipulating to the admission of certain pieces of evidence, making factual misrepresentations during opening statements, and failing to object to inadmissible evidence. *Salyers*, 2020-Ohio-147, at ¶ 8. In his second assignment of error, Salyers argued he was denied the constitutional right to present a complete defense because the trial court excluded evidence which would have exculpated him and inculpated Wireman. *Id.* at ¶ 38. In his third assignment of error, Salyers argued the cumulative effect of the errors alleged in his first and second assignments of error denied him a fair trial. *Id.* at ¶ 60. This Court rejected Salyers's arguments and affirmed the judgment of the trial court. *Id.* at ¶ 64.

{¶8} On January 27, 2020, Salyers filed a notice of intention to file a postconviction petition and a motion to compel Mercy Health – St. Vincent Medical Center to release all radiological imaging related to J.S. to both parties. On February 11, 2020, the trial court denied Salyers's motion to compel the production of records.

{¶9} On August 5, 2020, Salyers filed a petition for postconviction relief requesting an evidentiary hearing. Salyers asserted three claims for relief predicated on the premise that his trial counsel was ineffective. First, Salyers alleged his trial counsel was ineffective for failing to adequately investigate the cause of J.S.'s death. Specifically, Salyers alleged that his trial counsel was ineffective because he did not "ever consult[] with or retain[] an expert." Salyers contends that the opinions rendered by the State's experts at trial regarding J.S.'s cause of death were controversial and may have proven too weak to sustain a conviction if directly challenged. Salyers argued that his trial counsel's failure to consult with or retain an expert prejudiced him because "[h]ad [his] trial attorney fully investigated the basis of the State's expert testimony, several additional trial theories would have been opened." Salyers contended that if his trial counsel had consulted with or retained an expert witness: (1) trial counsel would have been better equipped to challenge the State's forensic conclusions and (2) trial counsel would not have been "hemmed in" by the conclusions that the State's experts reached about the timing of J.S.'s injuries.

{¶10} In his second claim for relief, Salyers argued his trial counsel was ineffective for failing to obtain and evaluate the radiology records the State's experts relied upon. Specifically, Salyers contended there was no evidence that the State provided him all relevant laboratory or hospital reports or that his trial counsel

sought to obtain J.S.'s birth records, hospital records, or radiological records. According to Salyers, his trial counsel's failure to obtain critical medical records was deficient because the State's expert witnesses relied on the hospital records, particularly the radiological records, to support their opinions that J.S. was the victim of shaking and blunt force trauma and became unresponsive immediately following his injury. Salyers argued that his trial counsel's "failure to obtain crucial medical records put counsel in a position where he could not make a strategic decision" regarding the manner and cause of J.S.'s death, could not conduct proper evaluation of the State's expert opinion reports, or adequately prepare for cross-examination of the State's expert witnesses. Salyers contended that his trial counsel's failure to obtain the complete hospital records prejudiced him. Specifically, Salyers argued that if his trial counsel had requested and obtained J.S.'s complete hospital records, "it is reasonably likely he would have engaged the services of an expert to assist and/or developed additional lines of cross-examination."

{¶11} In his third claim for relief, Salyers argued his trial counsel was ineffective for failing to request a *Daubert* hearing on the question of the timing of J.S.'s fatal injury. Salyers contended that although the State's expert witnesses concluded that J.S. lost consciousness immediately following his fatal injury and did not experience a lucid interval, an expert witness secured by Salyers's

postconviction counsel alleged that it is possible that J.S. experienced a lucid interval between the infliction of his injury and his loss of consciousness. Salyers argued that in a *Daubert* motion, his trial counsel could have pointed to failures in the medical examiner's methodology that rendered her conclusion about lucid intervals unreliable. According to Salyers, his trial counsel's failure to seek or secure an expert witness "left him blind to the methodological failures" of the State's expert witnesses. (Doc. No. 219). Salyers contended that if his trial counsel had consulted with an expert and obtained a full set of essential medical records, "the flaws in the State's expert opinion would have come into focus" and a *Daubert* motion challenging the expert witnesses' conclusion that J.S. did not experience a lucid interval "would have been a next step taken by reasonably competent counsel." (*Id.*). Salyers argues that he was prejudiced by his trial counsel's failure to file a *Daubert* motion because "an order prohibiting testimony about whether [J.S.] had a lucid interval would have critically shifted the case's trajectory." (*Id.*). Specifically, according to Salyers, the State would not have "benefited from the presumption that the last person present with [J.S.] was responsible for his death." (*Id.*). Salyers argued that testimony regarding Wireman's frustrations as a mother contrasted with testimony regarding Salyers's "playfulness" with the children would have been more probative. (*Id.*). Further, Salyers argued that a successful *Daubert* challenge would have heightened the probative value of the testimony that J.S. spent more

time with Wireman than Salyers in the 72 hours preceding his loss of consciousness. Salyers opined that reasonable probability exists that "had the State's expert testimony been limited to only reliable and demonstrable conclusions," jurors would have harbored reasonable doubt whether Wireman or Salyers fatally injured J.S. (*Id.*). Attached to Salyers's petition for postconviction relief were 11 affidavits in support.

{¶12} On November 2, 2020, the State filed its response to Salyers's petition for postconviction relief. The State argued that Salyers's trial counsel explored the idea of obtaining expert assistance, but determined as a matter of strategy not to hire an expert for utilization in Salyers's defense at trial, even if the reasons for the decision are not reflected in trial counsel's case file. Further, the State argued that trial counsel's decision was reasonable, as trial counsel vigorously pursued a defense that Wireman was the last person alone with J.S. before he lost consciousness and was, therefore, responsible for the child's death.

{¶13} With respect to Salyers's argument that his trial counsel was ineffective because he failed to obtain and evaluate radiology studies the State's experts relied upon, the State argued that the evidence presented at trial does not reflect that the radiological images referenced in Salyers's petition for postconviction relief were "relied upon to any relevant extent by the state's medical experts, much less that those records were central to the state's theory of the case *

* *." (Doc. No. 222). Rather, the State contended that because the case involved a deceased victim, it was the autopsy and findings resulting therefrom that provided the most "material evidence" regarding the coroner's conclusions regarding J.S.'s cause of death and the timing of the infliction of the fatal injuries. (*Id.*).

{¶14} The State also noted that although Salyers's postconviction expert stated that a lucid interval was "possible" between J.S.'s injury and loss of consciousness, the expert could not rule out the possibility that J.S.'s injury occurred immediately prior to his loss of consciousness. The State also argued that even if the trial court assumed that J.S. could have experienced a lucid interval following his injury, the evidence presented at the trial established that Salyers "had complete access" to J.S. prior to his loss of consciousness. Thus, even if J.S. did experience a lucid interval, Salyers could not be excluded as the perpetrator. Additionally, the State argued that Salyers's trial counsel vigorously pursued a theory at trial that Wireman had abused J.S. previously and had been the one to inflict the injury that caused the child's death.

{¶15} On November 3, 2020, the trial court filed a judgment entry denying Salyers's petition for postconviction relief without a hearing. In its judgment entry, the trial court found that Salyers's petition for postconviction relief was barred by res judicata. The trial court also found that, even if Salyers's petition for

postconviction relief was not barred by res judicata, Salyers failed to demonstrate that his trial counsel was ineffective.

{¶16} On November 13, 2020, Salyers filed a notice of appeal. He raises two assignments of error for our review, which we will discuss together.

**Assignment of Error No. I**

**The trial court abused its discretion when it determined that res judicata bars consideration of Gabe's postconviction petition. *State v. Cole*, 2 Ohio St.3d 112, 443 N.E.2d 169 (1982); *State v. Calhoun*, 86 Ohio St.3d 279, 714 N.E.2d 905 (1999); November 3, 2020 Judgment Entry; Postconviction Exhibits A-K.**

**Assignment of Error No. II**

**The trial court abused its discretion by finding that no new credible evidence supported Gabe's postconviction grounds for relief. *Hinton v. Alabama*, 571 U.S. 263, 274, 134 S.Ct. 1081, 188 L.Ed.2d 1 (2014); November 3, 2020 Judgment Entry; Postconviction Exhibits A-K.**

{¶17} In his first assignment of error, Salyers argues that the trial court abused its discretion by determining his petition for postconviction relief was barred by res judicata. In his second assignment of error, Salyers argues that the trial court erred by finding that he failed to demonstrate that his trial counsel was ineffective.

*Standard of Review*

{¶18} "R.C. 2953.21 governs petitions for post-conviction relief." *State v. Wine*, 3d Dist. Auglaize No. 2-15-07, 2015-Ohio-4726, ¶ 10. The statute sets forth who may petition for postconviction relief:

> Any person who has been convicted of a criminal offense * * * and who claims that there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States * * * may file a petition in the court that imposed sentence, stating the grounds for relief relied upon, and asking the court to vacate or set aside the judgment or sentence or to grant other appropriate relief. The petitioner may file a supporting affidavit and other documentary evidence in support of the claim for relief.

R.C. 2953.21(A)(1)(a) (Apr. 6, 2017) (current version at R.C. 2953.21(1)(a) (Apr. 12, 2021)).

{¶19} "The filing of a petition for postconviction relief does not automatically entitle the petitioner to an evidentiary hearing." *State v. Andrews*, 3d Dist. Allen No. 1-11-42, 2011-Ohio-6106, ¶ 11, citing *State v. Calhoun*, 86 Ohio St.3d 279, 282 (1999). Under R.C. 2953.21(D), "[b]efore granting a hearing on a petition filed under [R.C. 2953.21(A)], the court shall determine whether there are substantive grounds for relief."

> In making such a determination, the court shall consider, in addition to the petition, the supporting affidavits, and the documentary evidence, all the files and records pertaining to the proceedings against the petitioner, including, but not limited to, the indictment, the court's journal entries, the journalized records of the clerk of the court, and the court reporter's transcript.

R.C. 2953.21(D).

{¶20} "[I]f the court determines that there are no substantive grounds for relief, it may dismiss the petition without an evidentiary hearing." *State v. Jones*, 3d Dist. Defiance No. 4-07-02, 2007-Ohio-5624, ¶ 14. "The decision to grant the

petitioner an evidentiary hearing is left to the sound discretion of the trial court." *Andrews* at ¶ 11. Accordingly, "[w]e review the trial court's dismissal of a post-conviction petition without a hearing for abuse of discretion." *State v. Jeffers*, 10th Dist. Franklin No. 10AP-1112, 2011-Ohio-3555, ¶ 23. An abuse of discretion suggests the trial court's decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). When the abuse of discretion standard applies, an appellate court is not to substitute its judgment for that of the trial court. *State v. Thompson*, 3d Dist. Henry No. 7-16-10, 2017-Ohio-792, ¶ 11.

*Relevant Authority and Analysis*

**{¶21}** The trial court dismissed Salyers's petition after concluding, in part, that it was barred by the doctrine of res judicata. "Although a defendant may challenge his conviction and sentence by either a direct appeal or a petition for postconviction relief, any claims raised in a postconviction relief petition will be barred by res judicata where the claim was or could have been raised on direct appeal." *State v. Schwieterman*, 3d Dist. Mercer No. 10-09-12, 2010-Ohio-102, ¶ 23. "'[U]nder the doctrine of res judicata, a final judgment of conviction bars a convicted defendant who was represented by counsel from raising and litigating in any proceeding except an appeal from that judgment, any defense or any claimed lack of due process that was *raised or could have been raised by the defendant * ***

-12-

*\* on an appeal* from that judgment.'" (Emphasis sic.) *State v. Troglin*, 3d Dist. Union No. 14-09-04, 2009-Ohio-5276, ¶ 13, quoting *State v. Perry*, 10 Ohio St.2d 175 (1967), paragraph nine of the syllabus. The doctrine "promotes the principles of finality and judicial economy by preventing endless relitigation of an issue on which a defendant has already received a full and fair opportunity to be heard." *State v. Saxon*, 109 Ohio St.3d 176, 2006-Ohio-1245, ¶ 18, citing *State ex rel. Willys-Overland Co. v. Clark*, 112 Ohio St. 263, 268 (1925). Thus, the doctrine of res judicata bars all claims except those that were not available at trial or on appeal because they are based on evidence outside the record. *See Jones*, 2007-Ohio-5624, at ¶ 20. Further, "[t]he evidence submitted outside the record must be competent, relevant, and material to the issue at hand." *State v. Jackson*, 8th Dist. Cuyahoga No. 104132, 2017-Ohio-2651, ¶ 59.

{¶22} However, "since 'counsel cannot realistically be expected to argue his own incompetence, res judicata does not act to bar a defendant represented by the same counsel at trial and upon direct appeal from raising a claim of ineffective assistance of counsel in a petition for postconviction relief.'" *State v. Lentz*, 70 Ohio St.3d 527, 529-530 (1994), quoting *State v. Cole*, 2 Ohio St.3d 112 (1982), fn.1. But, "where a defendant was represented by new counsel on direct appeal 'who was in no way enjoined from asserting the ineffectiveness of appellant's trial counsel,' claims of ineffective assistance *must be brought on direct review*." (Emphasis sic.)

*State v. Bradley*, 3d Dist. Union No. 14-08-27, 2008-Ohio-6071, ¶ 8, quoting *Cole* at 114. "However, if an ineffective assistance of counsel issue concerns a matter outside the record, the appellate court could not consider it on direct appeal because the court can only consider matters contained in the record." *State v. Scott-Hoover*, 3d Dist. Crawford No. 3-04-11, 2004-Ohio-4804, ¶ 18, citing *State v. Smith*, 17 Ohio St.3d 98, 101 (1985), fn.1. Although ineffective assistance of trial counsel should ordinarily be raised on direct appeal, res judicata does not bar a defendant from raising ineffective assistance in a petition for postconviction relief if the claim is based on evidence outside the record. *Id.* "This principle applies even when the issue of ineffective assistance of counsel was raised on direct appeal." *Id.*

{¶23} "'To overcome the res judicata bar, evidence offered [outside] the record must demonstrate that the petitioner could not have appealed the constitutional claim based upon information in the original record.'" *State v. Lewis*, 3d Dist. Logan No. 8-19-08, 2019-Ohio-3031, ¶ 14, quoting *State v. Slagle*, 4th Dist. Highland No. 11CA22, 2012-Ohio-1936, ¶ 16, citing *Ohio v. Franklin*, 1st Dist. Hamilton Nos. C-930760 and B-8804127, 1995 WL 26281, *7 (Jan. 25, 1995); *State v. Lawson*, 103 Ohio App.3d 307, 315 (12th Dist.1995). "'This means that the evidence relied upon must not be evidence which was in existence or available for use at the time of trial or direct appeal, and finally, cannot be merely cumulative of

the evidence already presented.'" *Id.*, quoting *State v. Murphy*, 10th Dist. Franklin No. 00AP-233, 2000 WL 1877526, *3 (Dec. 26, 2000).

{¶24} "[I]n reviewing the documentary evidence in support of the petition, the trial court may judge their credibility in determining whether to accept the affidavits as true statements of fact for the purpose of showing substantive grounds for relief." *State v. Howald*, 3d Dist. Union No. 14-08-23, 2008-Ohio-5404, ¶ 11, citing *Calhoun*, 86 Ohio St.3d at 284. The trial court should consider the relevant factors when assessing the credibility of affidavits, including:

> (1) whether the judge reviewing the postconviction relief petition also presided at the trial, (2) whether multiple affidavits contain nearly identical language, or otherwise appear to have been drafted by the same person, (3) whether the affidavits contain or rely on hearsay, (4) whether the affiants are relatives of the petitioner, or otherwise interested in the success of the petitioner's efforts, and (5) whether the affidavits contradict evidence proffered by the defense at trial.

*Calhoun* at 285.

> An affidavit, being by definition a statement that the affiant has sworn to be truthful, and made under penalty of perjury, should not lightly be deemed false. However, not all affidavits accompanying a postconviction relief petition demonstrate entitlement to an evidentiary hearing, even assuming the truthfulness of their contents. Thus, where a petitioner relies upon affidavit testimony as the basis of entitlement to postconviction relief, and the information in the affidavit, even if true, does not rise to the level of demonstrating a constitutional violation, then the actual truth or falsity of the affidavit is inconsequential.

*Calhoun* at 284.

**{¶25}** With respect to Salyers's argument that he received ineffective assistance of trial counsel, we find that Salyers was represented by new counsel for his direct appeal. In fact, Salyers's appellate counsel did argue that his trial counsel was ineffective for (1) "stipulating to the admission of [Wireman's] videotaped interviews with law enforcement, in pursuit of a defense that identified [Wireman] as [J.S.'s] assailant"; (2) "making factual misrepresentations about the nature of [J.S.'s] injuries during opening statements"; and (3) "failing to object to inadmissible evidence related to [Salyers's] alleged prior acts of domestic violence" and "to the admission of transcript summaries and law enforcement opinions." *Salyers*, 2020-Ohio-147, at ¶ 8. Accordingly, Salyers's claims of ineffective assistance of trial counsel are barred by res judicata unless they are based on evidence outside the record. *See Jones*, 2007-Ohio-5624, at ¶ 22.

**{¶26}** Salyers argues that his petition for postconviction relief is based on evidence outside the record. Specifically, Salyers references the 11 affidavits attached to his petition for postconviction relief and alleges the information contained in the affidavits contain competent, relevant, and material information which advance his claim that his trial counsel was ineffective.

**{¶27}** Exhibit A, the affidavit of Patrick Clark, a supervising attorney at the Office of the Ohio Public Defender ("OPD"), states that upon receiving Salyers's file from the office of Salyers's trial counsel, the file included hospital records that

were not certified as complete. The affidavit also stated that trial counsel's file did not include radiological images, and the State indicated that it did not have the referenced radiological images in its file. Exhibit B, the affidavit of Lindsay Schmidt, a paralegal at OPD, also stated the file the OPD received from Salyers's trial counsel contained hospital records related to J.S. that were not certified as complete, and did not contain radiological images. Schmidt's affidavit also stated she found a several pages in the file that included the names and telephone numbers of various hospitals. A copy of the six handwritten pages, which included the names and telephone numbers of various hospitals, many of which are children's hospitals, was attached to the affidavit as a subexhibit. Exhibit C, the affidavit of Lisa Ostrolenk Caudill, the Librarian for OPD, revealed that she was contacted by Salyers's trial counsel in May 2017 for assistance finding a consulting pediatric radiologist. According to the affidavit, Ostrolenk Caudill returned trial counsel's email and included the names and contact information for two pediatric radiologists. A copy of the email correspondence was attached to the affidavit as a subexhibit.

{¶28} Exhibit D is the affidavit of Dr. Evan Matshes, a forensic pathologist consulted by Salyers's postconviction counsel. Incorporated into Dr. Matshes's affidavit is lengthy report containing his expert medical opinions regarding J.S.'s injuries and cause of death. Included in the report is Dr. Matshes expert opinion that J.S. died as a result of blunt force trauma to his head. Dr. Matshes further

opined that, contrary to the testimony of Dr. Schlievert and Dr. Scala-Barnett, the State's medical experts who testified that J.S. would have lost consciousness immediately following his ultimately-fatal injury, it is possible J.S. experienced a lucid interval following his injury. According to Dr. Matshes, the lucid interval, if experienced, could have lasted between hours and days. Accordingly, Dr. Matshes opined that the timing of J.S.'s lethal head trauma is unknown. Dr. Matshes's report also included his opinion that based on the totality of the available information, including the presence of unexplained new and old injuries, J.S.'s death is best classified as a homicide. Finally, Dr. Matshes's alleged in his report that J.S.'s autopsy was performed in a fashion that does not conform with national and international expectations for forensic pathologists.

{¶29} Exhibit E, the affidavit of Tom Coulter, Salyers's boss and close friend, detailed Salyers's work schedule in the days preceding J.S.'s injury. Exhibits F through K are affidavits of Salyers's family members and individuals associated with Salyers's family. In general, these affidavits summarize the affiants' interactions with Salyers, J.S., and Wireman in the days preceding J.S.'s injury, including J.S.'s demeanor over the preceding weekend. Several of the affidavits also contain observations of previous injuries observed on J.S. prior to the fatal injury and remarks criticizing Wireman's parenting.

{¶30} After reviewing Salyers's petition for postconviction relief and affidavits in support, the trial court determined that the documents "added no new credible evidence * * *." (Doc. No. 223). Accordingly, the trial court concluded that Salyers's petition was barred on the basis of res judicata.

{¶31} Upon review of the record, we find that Salyers's petition for postconviction relief is based, in part, on evidence outside of the record and is, therefore, not barred by res judicata. Our review of the record indicates that some of the evidence and affidavits Salyers attached to his petition for postconviction relief, such as the affidavits of his close family and friends, were merely cumulative of evidence already in the record. However, we find that several of the affidavits and supporting documentation comprise evidence outside the record. For example, the expert medical opinion of Dr. Matshes demonstrates that Salyers could not have appealed his constitutional claim based upon information in the original record. Accordingly, Salyers's petition for postconviction relief is not totally barred by res judicata. Therefore, we turn to the merits of his claim that he received ineffective assistance of trial counsel.

{¶32} A defendant asserting a claim of ineffective assistance of trial counsel must establish: (1) the counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defendant. *State v. Kole*, 92 Ohio St.3d 303, 306 (2001), citing *Strickland v. Washington*, 466

U.S. 668, 687, 104 S.Ct. 2052 (1984). In order to show counsel's conduct was deficient or unreasonable, the defendant must overcome the presumption that counsel provided competent representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment. *Strickland* at 689. Counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie*, 81 Ohio St.3d 673, 675 (1998). Tactical or strategic decisions, even if unsuccessful, do not generally constitute ineffective assistance. *State v. Frazier*, 61 Ohio St.3d 247, 255 (1991). Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client. *See State v. Bradley*, 42 Ohio St.3d 136, 141-142 (1989), citing *State v. Lytle*, 48 Ohio St.2d 391, 396-397 (1976), *vacated in part on other grounds*, *Lytle v. Ohio*, 438 U.S. 910, 98 S.Ct. 3135 (1978).

{¶33} Prejudice results when "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Bradley* at 142, quoting *Strickland* at 694. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.*, quoting *Strickland* at 694. If the petitioner cannot prove one of the elements, it is "unnecessary for a court to consider the other prong of the test." *State v. Walker*, 3d Dist. Seneca No. 13-15-42, 2016-Ohio-3499, ¶ 20.

**{¶34}** "In evaluating whether a petitioner has been denied effective assistance of counsel, this court has held that the test is 'whether the accused, under all the circumstances, * * * had a fair trial and substantial justice was done.'" *Calhoun*, 86 Ohio St.3d, at 289, quoting *State v. Hester*, 45 Ohio St.2d 71 (1976), paragraph four of the syllabus.

**{¶35}** The failure to make either the deficiency or prejudice showing defeats a claim of ineffective assistance of counsel. *State v. Frye*, 10th Dist. Franklin Nos. 14AP-988 and 14AP-989, 2015-Ohio-3012, ¶ 11, citing *Strickland*, 466 U.S. at 697. Thus, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. * * * If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland* at 697. Accordingly, we will first address Salyers's argument that he was prejudiced by his trial counsel's alleged errors.

**{¶36}** Salyers offers several arguments in support of his position that he was prejudiced by his trial counsel's alleged deficient performance. First, Salyers argues that if his trial counsel had consulted with a medical expert it "would have opened additional defense theories about the manner of J.S.'s death." (Appellant's Reply Brief at 4). Salyers argues that because his trial counsel did not consult with an expert witness, none of his trial counsel's decisions could be tactical or strategic.

{¶37} The basis of Salyers's argument that his trial counsel failed to conduct an adequate investigation into J.S.'s injuries and death is that he failed to retain an expert witness to review the medical evidence surrounding J.S.'s injuries and death. In particular, Salyers contends that, if his trial counsel had retained Dr. Matshes or some likeminded medical expert, the medical expert could have testified that it is theoretically possible that J.S. experienced a lucid interval between his ultimately fatal injury and his loss of consciousness. According to Salyers, this could have "created advantageous trial theories."

{¶38} Additionally, Salyers contends that a medical expert could have challenged the forensic pathologist's conclusions. Specifically, Salyers argues that a medical expert could have challenged the forensic pathologist's credibility by opining that she failed to meet standard practices. Further, Salyers contends that a medical expert could have challenged the forensic pathologist's opinion that J.S.'s injuries suggest that he was shaken. According to Salyers, by challenging the forensic pathologist's findings, "trial counsel could have advanced an affirmative case, arguing that J.S. experienced a lucid interval after [Wireman] fatally injured him in the day or hours leading to his collapse." (Appellant's Brief at 11).

{¶39} After reviewing the record, including Salyers's petition for postconviction relief, we are unpersuaded. First, Salyers's argument that further investigation would have necessarily led to Salyers retaining an expert witness is

not only vague and speculative, but it assumes that Salyers's trial counsel failed to consult an expert witness or pursue the possibility of hiring an expert witness. However, several of the affidavits attached to Salyers's petition for postconviction relief directly suggest that Salyers's trial counsel did pursue the possibility of hiring an expert witness. Specifically, the file contained six handwritten pages of various hospitals, many of which were children's hospitals. (Doc. No. 219, Ex. B). It is reasonable to infer that this list was contact information for potential medical experts. Additionally, the affidavit of the Librarian for OPD states that Salyers's trial counsel actually did contact her to request assistance in locating a consulting pediatric radiologist. Further, the affidavit states that she provided trial counsel with the contact information for two pediatric radiologists. (Doc. No. 219, Ex. C). Importantly, we note that Dr. Matshes's name and contact information was not included in either the handwritten pages or the response from the OPD librarian. Accordingly, for Salyers to assume that his trial counsel failed to investigate the possibility of consulting or hiring an expert witness simply because did not consult with Dr. Matshes is not supported by the record, particularly in light of the evidence that Salyers's trial counsel did, in fact, consider the strategy of consulting with or hiring an expert witness. Further, the record demonstrates Salyers's trial counsel chose, as a matter of strategy, not to engage the services of an expert witness, despite the reasons for that decision not being reflected in trial counsel's case file.

{¶40} With respect to Salyers's argument that he was prejudiced because his trial counsel's case file did not contain certain radiological images, we find that the particular images that Salyers references were not relied upon by the State's medical experts. Further, Salyers has failed to establish that the radiological images were central to the State's theory of the case. Moreover, it appears that the State itself did not have the images in its file and did not rely on them when crafting and presenting its theory of the case. Nor does Salyers establish how the particular images, if present in the case file, would have resulted in a different outcome at trial. Rather, Salyers opines that the presence of the images would have encouraged trial counsel to seek the assistance of an expert witness to assist in interpreting the images. This argument is speculative, at best, and fails to demonstrate that Salyers was in any way prejudiced by the absence of the radiological images.

{¶41} Next, although Salyers argues he was prejudiced by his trial counsel's failure to employ an expert witness, Dr. Matshes's report and medical opinions expressed therein are largely consistent with the medical opinions offered by the State's medical experts. Consistent with the State's medical expert, Dr. Matshes concludes that J.S.'s cause of death "is best certified as a homicide." (Doc. No. 229, Ex. D). Dr. Matshes based this conclusion on the "totality of available information, including the presence of unexplained old and new injuries." (*Id.*).

{¶42} Although Dr. Matshes's report does include some opinions that differ from the opinions of the State's medical experts, Dr. Matshes's opinion is not necessarily inconsistent with the State's theory of the case. Most notably, Dr. Matshes asserts in his report that the timing of J.S.'s ultimately lethal head trauma is "unknown" and that it is "possible" that J.S. experienced a lucid interval between the ultimately lethal blunt impact head trauma and when he lost consciousness on April 1, 2018. Although Salyers relies on these statements to suggest that such a medical opinion, if presented at trial, could have expanded the timeline of the injury and lent support to the theory that Wireman delivered the fatal injuries, we note that Dr. Matshes's report is speculative. Although Dr. Matshes's asserts that it is "possible" that J.S. experienced a lucid interval, the report does not state that J.S. actually *did* experience a lucid interval. Accordingly, Dr. Matshes's opinion regarding the possibility of a lucid interval is not necessarily at odds with the State's theory of the case and evidence presented at trial. Further, even if J.S. did experience a lucid interval following his fatal injury, the timeline established at trial demonstrates that Salyers was with the child in the hours and days prior to the injury. Specifically, the State presented unrefuted testimony that Salyers was the only adult present in the home with J.S. earlier in the day. Additionally, Salyers admitted that he was physically abusive with J.S. earlier in the day, including shaking J.S., "flicking" his penis, and pushing his hand into J.S.'s stomach. Salyers also admitted

to shaking J.S. on another occasion, several weeks prior to his death. This evidence is consistent with the medical evidence and testimony of the State witnesses that J.S. had been shaken and suffered injuries that were at various stages of healing.

{¶43} Furthermore, a review of the trial record reveals that Salyers's trial counsel robustly pursued a theory that Wireman had abused J.S. previously and inflicted his fatal injury. Specifically, with regard to the fatal injury, trial counsel pursued a theory that, although Salyers put J.S. to bed on April 1, 2018, it was Wireman who found him unresponsive. Salyers's defense vigorously pursued a theory that Wireman fatally injured J.S. immediately prior to J.S. going limp in her arms. To present Wireman as a viable alternative suspect, Salyers's trial counsel cross-examined the lead detective regarding his interviews with Wireman to point out inconsistencies present in her statements to law enforcement. Trial counsel also highlighted Wireman's substance addiction and attempted to present Wireman as an abusive and neglectful parent. Moreover, defense counsel attempted to demonstrate that law enforcement immediately focused on Salyers as a suspect and was not willing to objectively consider Wireman as a suspect in her son's death. Specifically, defense counsel contrasted the recordings of police interviews with Wireman and Salyers to demonstrate that law enforcement treated Wireman sympathetically while treating Salyers with suspicion.

**{¶44}** Similarly, Dr. Matshes's opinion regarding J.S.'s cause of death is not inherently inconsistent with the opinions rendered by the State's medical expert at trial. Specifically, Dr. Matshes opined that J.S.'s death was caused by "blunt head trauma" that was the result of his head being "struck with, by[,] or against something" and that the medical evidence does not suggest that J.S. "must" have been shaken. (Doc. No. 229, Ex. D). Dr. Schlievert, the State's expert in pediatric abuse who performed a physical examination on J.S. prior to his death, opined that although J.S. may have been shaken, J.S.'s injuries were also caused by "some sort of blunt force trauma exerted at two different places on the skull." (Mar. 12-19, 2019 Tr. at 480). Dr. Scala-Barnett, the forensic pathologist who performed the autopsy on J.S., opined that J.S.'s fatal injury was the result of shaking and impact with a hard surface. (*Id.* at 625). Thus, although the State's medical experts both stated that J.S.'s fatal injuries likely included shaking, both of the State's experts also opined that J.S.'s death was caused at least in part by his head being struck against or by a hard object. Further, all three medical experts agree that J.S.'s death was a homicide. Accordingly, although Dr. Matshes does not assign the same importance to the possibility that J.S. was shaken, all three experts agree that J.S.'s death was the result of blunt force trauma to his head. Thus, particularly in light of Salyers's admission that he shook J.S. on multiple occasions, including a time preceding his loss of consciousness, we do not find that Salyers was prejudiced by

his trial counsel's failure to call an expert witness to testify regarding J.S.'s cause of death.

{¶45} With respect to Salyers's argument that the forensic pathologist performed J.S.'s autopsy in a way that did not conform with national and international expectations for forensic pathologists, we are unpersuaded. First, although Dr. Matshes opines in his report that J.S.'s autopsy fell below standards, Dr. Matshes fails to support this assertion with references to the specific national and international standards that the forensic pathologist apparently failed to meet. Furthermore, Salyers fails to identify specifically how the forensic pathologist's alleged errors prejudiced him aside from mere speculation that Dr. Matshes's opinion regarding the quality of the autopsy may have lessened the credibility of the forensic pathologist in the eyes of the jury.

{¶46} In conclusion, after reviewing the totality of the evidence presented at trial and the information proffered by Salyers in support of his petition for postconviction relief, including the affidavits and their attachments, we do not find the trial court abused its discretion in determining Salyers failed to demonstrate that he was prejudiced by his trial counsel's alleged errors. *See State v. Jones*, 2d Dist. Miami No. 2016-CA-22, 2018-Ohio-673, ¶ 67-68 (finding that although trial counsel's performance was deficient for failing to retain an expert to assist with medical issues, this deficiency did not prejudice the defendant). We also determine

that the trial court did not abuse its discretion when it concluded that the post-conviction evidence, in the context of the entire record, would not support a reasonable probability of a different result. We note that Salyers's petition for postconviction relief was decided by the same judge who presided over his trial and, therefore, had the opportunity to view and assess the credibility of all of the witnesses and evidence presented at trial. Accordingly, the evidence Salyers submitted with his postconviction petition is not sufficient to undermine our confidence in the outcome of his trial. Salyers was afforded a fair trial and substantial justice was done. *Calhoun*, 86 Ohio St.3d at 289.

{¶47} Finally, Salyers argues that the trial court abused its discretion by dismissing his petition for postconviction relief without a hearing. However, after reviewing the record, including the petition, supporting affidavits, and files and records in this case, we find that the trial court did not abuse its discretion by denying Salyers's petition for postconviction relief without first holding an evidentiary hearing because the claim was facially untenable in light of the evidence he submitted.

{¶48} Accordingly, Salyers's assignments of error are overruled.

**{¶49}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the Allen County Court of Common Pleas.

*Judgment Affirmed*

**WILLAMOWSKI, P.J. and ZIMMERMAN, J., concur.**

**/jlr**